**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ALAN PINYAVAT, Derivatively on Behalf of Nominal Defendant GOODRX HOLDINGS, INC., | Case No. 1:21-cv |
| | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| DOUGLAS HIRSCH, TREVOR BEZDEK, KARSTEN VOERMANN, CHRISTOPHER ADAMS, JULIE BRADLEY, DIPANJAN DEB, ADAM KAROL, JACQUELINE KOSECOFF, STEPHEN LESIEUR, GREGORY MONDRE, and AGNES REY-GIRAUD, | |
| Defendants, | |
| and | |
| GOODRX HOLDINGS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

By and through his undersigned counsel, Plaintiff Alan Pinyavat ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant GoodRx Holdings, Inc. ("GoodRx" or the "Company") and against certain current and former officers and directors of the Company for violations of the securities law, breaches of fiduciary duties, unjust enrichment, abuse of control and gross mismanagement. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by GoodRx and other related parties with the United States Securities and Exchange

Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on GoodRx's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Terenzini v. GoodRx Holdings, Inc. et al.,* Case No. 2:20-cv-11444-DOC-MARx (C.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly-available information concerning GoodRx and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant GoodRx against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' violations of the securities laws and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately September 23, 2020, to the present (the "Relevant Period").[1]

2.     GoodRx operates a consumer-focused digital healthcare platform which provides consumers access to price transparency and discount codes for, *inter alia*, generic and brand medications throughout the United States.

3.     The Company's services are free to consumers, and it primarily generates revenue through prescription transaction fees paid Pharmacy Benefit Managers ("PBMs"). PBMs pay

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately September 23, 2020, to November 16, 2020; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

GoodRx a prescription transaction fee when a prescription is filled using a GoodRx discount code.

4.     The Company was founded in September of 2011, and in July of 2020, the Company initiated the process of going public. On July 2, 2020, the Company filed a draft registration statement on Form DRS with the SEC in preparation for the planned initial public offering ("IPO"). On August 28, 2020, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement"). On September 14, 2020, the Company filed an amendment to the Registration Statement on Form S-1/A with the SEC. The amendment stated that 39,807,691 shares would be registered in the IPO, at a proposed maximum offering price per share of $28.00. An additional amendment was filed with the SEC on September 22, 2020. That same day, September 22, 2020, the Registration Statement was declared effective.

5.     On September 23, 2020, the Company's stock began trading publicly on the NASDAQ. On September 24, 2020, the Company filed a Prospectus on Form 424B4 (the "Prospectus") with the SEC in connection with the IPO. The Prospectus formed part of and was incorporated into the Registration Statement. The Prospectus, the Registration Statement, and the amendments to the Registration Statement are collectively referred to herein as the "IPO Documents." Through the IPO, over 28.6 million shares of stock were sold at $33 per share. GoodRx received aggregate net proceeds of about $886.9 million. Of the proceeds, Idea Men, LLC ("Idea Men") — whose managing members included Defendants Douglas Hirsch ("Hirsch") and Trevor Bezdek ("Bezdek") — and Spectrum Equity VII, L.P. ("Spectrum") — whose managing directors included Defendant Stephen LeSieur ("LeSieur") — collectively gained approximately $348.9 million from the sale of their GoodRx shares.

6.    The IPO Documents highlighted GoodRx's competitive advantage and described the risks facing the Company. The IPO Documents stated only that the Company may deal with increased competition in the future that could negatively impact GoodRx's business and its ability to attract and retain consumers.

7.    The Individual Defendants failed to issue a statement correcting the material misstatements and omissions in the IPO Documents referenced in the preceding paragraphs. In fact, the Company's 3Q 2020 10-Q (defined below), which the Company filed with the SEC on November 12, 2020, repeated many of the same false and misleading statements contained in the IPO Documents. The 3Q 2020 10-Q did this even though, prior to its being filed, Amazon.com, Inc. ("Amazon") announced its electronic pharmaceutical service designed to compete with GoodRx. On a November 12, 2020, earnings call, Defendant Bezdekeven responded to a question regarding changes in the "competitive environment" and stated that the Company had "not seen . . . any competitors that have really impacted [GoodRx's] business[.]"

8.    These statements omitted the crucial fact that Amazon had developed a service which would be a direct competitor of GoodRx, that Amazon's service was scheduled to deploy only days after the Company's IPO, and that, therefore, increased competition in the future was not a hypothetical risk, but a serious, actual risk which gravely threatened the Company.

9.    Specifically, the IPO Documents and 3Q 2020 10-Q failed to disclose that Amazon would give Amazon Prime members up to an 80% discount off of the price of generic medications and up to a 40% discount off of the price of brand-name prescription medications beginning in November 2020. On November 17, 2020, Amazon issued a press release which introduced "Amazon Pharmacy."

10.     Following Amazon's announcement, the price of the Company's stock fell $10.51 per share, or approximately 22.5%, from $46.72 at the close of trading on November 16, 2020, to $36.21 at the close of trading on November 17, 2020, on very heavy trading volume.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about GoodRx's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Amazon was developing and imminently releasing an online pharmacy offering heavily discounted prescription medication; (2) the Individual Defendants intentionally held the Company's IPO before Amazon announced this service, to avoid having its existence negatively affect the Company's IPO share price; and (3) thus the IPO was intentionally planned in such a way as to sell shares of the Company's common stock at artificially inflated prices. As a result, GoodRx's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants' misconduct has subjected GoodRx, its two Co-Chief Executive Officers ("Co-CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in the Securities Class Action, along with creating the need to undertake internal investigations and the need to implement adequate internal controls over its financial reporting. As a result of this, the Company will have to expend many millions of dollars.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the claims arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act

of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction.   Also, the Company's principal executive offices are located in this District.

## PARTIES

16.     Plaintiff has been a shareholder since prior to the start of the Relevant Period, is currently, and at all relevant times has been, a holder of GoodRx common stock.

17.     Nominal Defendant GoodRx is incorporated under the laws of Delaware with its principal executive offices located at 2701 Olympic Boulevard, Santa Monica, California 90404.

18.     Defendant Douglas Hirsch ("Hirsch") is and has been Co-CEO and a director of GoodRx since September 2011. Defendant Hirsch is also a Co-founder of the Company. In his role as Co-CEO for the fiscal year of 2020, Defendant Hirsch received $267,650,186 in total compensation.

19.     Defendant Trevor Bezdek ("Bezdek") is and has been the Co-CEO and a director of GoodRx since September 2011. Defendant Bezdek is also a Co-founder of the Company. Defendant Bezdek is a member of the Nominating and Corporate Governance Committee, as well as the Compliance Committee. In his role as Co-CEO for the fiscal year of 2020, Defendant Bezdek received $267,652,442 in total compensation.

6

20.     Defendant Karsten Voermann ("Voermann") is and has been the CFO of GoodRx since March 2020. In his role as CFO, per the terms of his offer letter, Defendant Voermann was entitled to a base salary of $400,000 per year, a signing bonus of $250,000, and other compensation in the form of certain benefits and equity compensation.

21.     Defendants Hirsch, Bezdek, and Voermann are referred to collectively herein as the "Officer Defendants."

22.     Defendant Christopher Adams ("Adams") is and has been a director of GoodRx since October 2015. Defendant Adams is the Chair of the Nominating and Corporate Governance Committee.

23.     Defendant Julie Bradley ("Bradley") is and has been a director of GoodRx since August 2020. Defendant Bradley is the Chair of the Audit Committee. In her role as director of the Company for the fiscal year 2020, Defendant Bradley received $748,207 in total compensation.

24.     Defendant Dipanjan Deb ("Deb") is and has been a director of GoodRx since October 2015. Defendant Deb is a member of the Compensation Committee.

25.     Defendant Adam Karol ("Karol") is and has been a director of GoodRx since October 2018. Defendant Karol is a member of the Audit Committee and Compliance Committee.

26.     Defendant Jacqueline Kosecoff ("Kosecoff") is and has been a director of GoodRx since May 2016. Defendant Kosecoff is a member of the Compensation Committee and Audit Committee. In her role as director of the Company for the fiscal year 2020, Defendant Kosecoff received $121,842 in total compensation.

27.     Defendant Stephen LeSieur ("LeSieur") is and has been a director of GoodRx since October 2015. Defendant LeSieur is a member of the Compliance Committee.

28.     Defendant Gregory Mondre ("Mondre") is and has been a director of GoodRx since October 2018. Defendant Mondre is the Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

29.     Defendant Agnes Rey-Giraud ("Rey-Giraud") is and has been a director of GoodRx since June 2016. Defendant Rey-Giraud is the Chair of the Compliance Committee and a member of the Audit Committee. In her role as a director of the Company for the fiscal year 2020, Defendant Rey-Giraud received $118,601 in total compensation.

30.     Defendants Hirsch, Bezdek, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud are sometimes referred to herein as the "Director Defendants."

31.     Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud are collectively referred to herein as the "Individual Defendants." GoodRx and the Individual Defendants are collectively referred to herein as "defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

32.     By reason of their positions as officers, directors, and/or fiduciaries of GoodRx, and because of their ability to control the business and corporate affairs of GoodRx, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage GoodRx in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of GoodRx and its

shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

33.     Each director and officer of the Company owes to GoodRx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

34.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

35.     Pursuant to the Audit Committee charter of GoodRx (effective as of September 11, 2020),[2] the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of GoodRx Holdings, Inc. (the "Company") and the audits of the financial statements of the Company."

36.     The Audit Committee charter provides, among other things, the duties and responsibilities of members of the committee. Specifically, the Audit Committee charter states:

- *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

- *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations."

---

[2] Available at https://investors.goodrx.com/static-files/abee8883-ab7b-4bcd-8db1-da434fa13ae9

- *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for the inclusion in each of the Company's annual proxy statements.

- *Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Duties Pursuant to the Company's Code of Business Conduct and Ethics

37.     The Individual Defendants, as officers and/or directors of GoodRx, were also bound by the Company's Code of Business Conduct and Ethics (the "Code") (effective as of September 11, 2020)[3] which, according to the Code, "contains general guidelines for conducting the business of GoodRx Holdings, Inc. (the "Company or "we") consistent with the highest standards of business ethics.

38.     In a sub-section of the code titled "Reporting Violations of the Code," the Code states:

> All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to the Company. If you know of or suspect a violation of this Code, immediately report the conduct to your supervisor or the Company's General Counsel.

39.     Regarding "Conflicts of Interest," the Code states:

> Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest" and should seek to avoid even the appearance of a conflict of interest. A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

---

[3] Available at https://investors.goodrx.com/static-files/51fd1f5a-9ffc-402a-bedb-cf35308c0af3

40.     Concerning "Competition and Fair Dealing," the Code states:

All employees should endeavor to deal fairly with fellow employees and with the Company's collaborators, licensors, customers, suppliers and competitors. Employees should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice. Employees should maintain and protect any intellectual property licensed from licensors with the same care as they employ with regard to Company-developed intellectual property. Employees should also handle the nonpublic information of our collaborators, licensors, suppliers and customers responsibly and in accordance with our agreements with them, including information regarding their technology and product pipelines.

41.     Concerning   the   "Accuracy   of   Financial   Reports   and   Other   Public

Communications" the Code States:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

42.     Concerning "Compliance with Laws and Regulations" the Code states:

Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position.

43.     Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### Control, Access, and Authority

44.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of GoodRx, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by GoodRx.

45.     Because of their advisory, executive, managerial, and directorial positions with GoodRx, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of GoodRx.

46.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GoodRx and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

47.     To discharge their duties, the officers and directors of GoodRx were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of GoodRx were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how GoodRx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that GoodRx was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

### BREACHES OF DUTIES

48. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to GoodRx and its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of GoodRx, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of GoodRx, the absence of good faith on their part, and a reckless disregard for their duties to GoodRx and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to GoodRx.

49. The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make

false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

50.     In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, GoodRx has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

53.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

54.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or

14

negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company and the IPO

56.     Nearly a decade ago, Defendant Hirsch, a former Facebook Inc. executive, and Defendant Bezdek created what has now become a popular and fast-growing digital U.S. prescription drug shopping platform designed to aid people in finding the lowest prescription drug prices in their local areas. In October 2015, GoodRx acquired 100% of the outstanding shares of GoodRx, Inc., the entity that owns and operates the digital shopping platform created by Defendants Hirsch and Bezdek.

57.     GoodRx's core business is a digital platform that provides consumers free access to discounted prescription drug prices. According to the Company's website, consumers can use GoodRx's platform to save up to 80% on most prescription drugs at over 70,000 U.S. pharmacies. Through GoodRx's digital platform consumers can compare drug prices and find the lowest cost pharmacy for their prescriptions. The Company provides consumers with these services via a mobile app and website that display prices and discounts at local and mail-order

pharmacies for both insured and uninsured Americans. While the Company also generates revenue from subscription, advertising and telehealth services, at the time of the IPO, GoodRx generated over 90% of its revenues from its prescription drug discount program. Because GoodRx's prescription drug discount program is free to consumers, the revenue the Company earns from its core business is primarily paid by PBMs who maintain non-insurance cash networks with pharmacies. The categories and brands of medication, as well as the pricing, that GoodRx publishes for consumers are determined by the Company's contracted PBMs; essentially GoodRx's PBMs contracts allow the Company to market the PBMs negotiated rates through the Company's platform. GoodRx aggregates the discounted drug prices negotiated by the PBMs and shows the lowest available price for each pharmacy/drug combination on its website and mobile app. GoodRx's platform generates a "GoodRx code" that allows consumers free access to the discounted drug prices when the code is presented at the chosen pharmacy. The PBMs' GoodRx contracts will either pay GoodRx on a percentage of the fee arrangement or a fixed fee per transaction arrangement. Under the percentage of the fee arrangement, when a consumer uses the GoodRx code to fill a prescription, the pharmacy pays the PBM whose pricing is used, with a majority of that fee shared with GoodRx. Under both arrangements, the more volume that goes through the GoodRx platform, the more revenue the Company generates.

58.     At the time of the IPO, because there was a significant concentration of PBMs in the U.S. healthcare industry, a limited number of PBMs generated a significant portion of GoodRx's revenue and the discount prices GoodRx published on its platform. For example, in the Registration Statement, GoodRx reported that the Company's three largest PBM partners accounted for 48% of the Company's revenue in the first half of 2020 and that PBMs Navitus,

MedImpact and Express Scripts each accounted for more than 10% of revenue in the same period.

59.     GoodRx uses a key metric called "Monthly Active Consumers" ("MAC") to measure and report the growth of the Company's prescription drug program. MAC refers to the number of unique consumers who have used a GoodRx code to purchase prescription medication in a given calendar month. At the time of the IPO, GoodRx reported 4.4 million MACs for the second quarter of 2020.

60.     On August 28, 2020, GoodRx filed with the SEC a Form S-1 Registration Statement (the "Registration Statement") for its IPO signed by the Individual Defendants. The Registration Statement, as amended, was declared effective by the SEC on September 22, 2020.

61.     On September 22, 2020, GoodRx announced the pricing of its IPO of 34.6 million shares of its Class A common stock at an initial public offering price of $33 per share. The Company announced that of the shares offered, 23.4 million were being offered by the Company and 11.2 million shares were being offered by certain of GoodRx's insiders and selling shareholders. In addition, GoodRx agreed to give the underwriters a 30-day option to purchase an additional 5.2 million shares of Class A common stock from GoodRx at the initial offering price, which the underwriters exercised.

62.     On September 24, 2020, GoodRx filed with the SEC a prospectus, which forms part of the Registration Statement (the "Prospectus"), for the IPO offering to sell to the public over 23.4 million common shares by the Company (excluding the underwriters' option to purchase an additional 5.2 million common shares) and 11.2 million common shares by certain selling stockholders.

63.     On September 25, 2020, GoodRx closed its IPO. In the offering, the Company and certain existing stockholders sold over 39.8 million common shares for $33 per share, including the full exercise of the underwriters' option, generating over $1.3 billion in gross offering proceeds.

64.     Unbeknownst to investors, the Registration Statement failed to disclose that GoodRx's core business was facing material risk of competition from tech giant Amazon. At the time of the IPO, Amazon was developing and planning the imminent launch of an online pharmacy offering at Amazon.com and PrimeRx, a prescription drug savings program for its millions-of Amazon Prime members that mirrored GoodRx's own prescription drug discount program.

65.     At the time of the IPO, Amazon was partnering with Inside Rx (a business unit of Express Scripts), to launch its PrimeRx product. Through Amazon's partnership with Inside Rx, a cross-industry partnership between Express Scripts, GoodRx, pharmaceutical manufacturers and participating pharmacies across the county, Amazon would be able to compete directly with GoodRx by offering its Amazon Prime members the identical savings benefit as GoodRx – up to 80% off prescription drugs that could be used at thousands of pharmacies nationwide, including major chains, most of whom were also in GoodRx's network of pharmacies.

66.     Given Amazon's size and access to millions of Amazon Prime members, Amazon's entry into the prescription drug discount market, with Inside Rx as its partner, was a material competitive threat to GoodRx's core business. As discussed below, the materiality to investors of a competitor the size of Amazon was demonstrated when GoodRx's stock price dropped a stunning 23% following Amazon's announcement that it was entering the prescription

drug discount market and another 8% when Amazon subsequently made an announcement showing it was taking more aggressive steps to compete with GoodRx.

67.     Through their close business relationships with Amazon, Inside Rx and Express Scripts, Defendants knew of Amazon's imminent launch of PrimeRx at the time of the IPO. GoodRx was a founding partner in Inside Rx along with Express Scripts, who was also one of GoodRx's largest PBMs. In May 2017 GoodRx partnered with Express Scripts, and other cross-industry partners, to launch Inside Rx. After Amazon disclosed its entry into the prescription drug discount market, Defendants repeatedly touted GoodRx's existing partnership with Inside Rx and the fact that it was one of the launch partners of Inside Rx. For example, on November 18, 2020, the day after Amazon made its announcement, during an investor conference call defendants admitted that GoodRx was a "founding partner of Inside Rx. In fact, we've worked with them for quite some time."

68.     Additionally, at the time of the IPO, GoodRx had been in an ongoing two-year partnership with Amazon's subsidiary, PillPack, an online pharmacy Amazon acquired in 2018. As defendants admitted during investor conference calls following Amazon's announcement, defendants communicated regularly with Amazon through this partnership. For example, during a December 3, 2020 investor conference call, Defendant Hirsch confirmed GoodRx's pre-IPO partnership with Amazon, stating: "I'm very happy to be partnered with Amazon. We communicate with them regularly." Additionally, on a December 3, 2020 investor conference call, Defendant Hirsch admitted that since 2018 GoodRx had partnered with Amazon in providing customers of PillPack with GoodRx discounts and acknowledged that "we're both personal and professional friends with PillPack."

69.     While failing to disclose the material competitive risk GoodRx was facing from Amazon's imminent entry into the prescription drug discount market, the Registration Statement assured investors that GoodRx had a competitive advantage, portraying the Company as a "***market leader with a significant scale and brand advantage over our competitors***" and boasted about the Company's partnerships across the healthcare industry and its "***deep competitive moat***." Defendants also touted that GoodRx had been the "***most downloaded medical app on the Apple App Store and Google Play App Store***" for the three years prior to the IPO.

70.     The Registration Statement also highlighted the size of GoodRx's database and competitive prices stating: "***The size of our database, combined with our proprietary platform, allows us to present highly competitive prices to consumers. We believe that we currently have the largest database of PBM prices in the United States***." The Registration Statement also stated that for many of GoodRx's PBM partners, the Company was "***their only significant direct-to-consumer channel***."

71.     Analysts who initiated coverage of GoodRx common stock shortly following the IPO noted the importance of GoodRx's competitive advantage and the potential risk to GoodRx if a large retail competitor such Amazon were to enter the prescription drug discount card market. For example, on October 19, 2020, Deutsche Bank issued a report initiating coverage with a target price of $50 per share, noting that: "GoodRx does not face a lot of competition . . . ."; the "company is the only scale player in prescription drug price comparison"; and GoodRx "is the leader (by a large margin) among pharma discount card providers in the country." The Deutsche Bank report also noted that a key risk to GoodRx's story was that "other internet players (*e.g.* Amazon or Google) [could] get into the price discovery market for drugs and/or

provide heavily discounted drugs themselves." Similarly, on October 19, 2020, Cowen issued a report initiating coverage of GoodRx stock with a target price of $63 per share and an outperform rating, noting, "[w]ith 15M monthly visitors and 4.9M monthly active consumers, [GoodRx] has the scale leverage that its competitors lack, allowing it to negotiate more favorable pricing terms with PBMs" and "[w]e believe there are no true pure-play competitors to GoodRx that are formidable and at scale." Additionally, RBC Capital Markets issued a report on October 18 2020, noting:

> GoodRx currently commands a leading market position among its peers in the core Discount Card space with 4.4MM Monthly Active Consumers and over 15MM Monthly Visitors to the platform, has an impressive scale contracting with over a dozen PBMs with its services accepted at a vast majority of pharmacies in the country. . . .

The report also noted the risk that "large retail pharmacies like Walmart, CVS and Walgreens as well as Amazon – all of which well exceed GoodRx in both scale and marketing wallet – could threaten the company's leadership and [competitive] moat if they were to lean into the space."

72.    Mere weeks following the Company's IPO, on November 17, 2020, Amazon announced what the Registration Statement failed to disclose; that tech giant Amazon was launching PrimeRx, a prescription drug discount program identical to GoodRx's for all Amazon Prime members that enabled access to negotiated PBM pricing for prescriptions filled at Amazon's own pharmacy and 50,000 retail pharmacies nationwide. In response to this news, the price of GoodRx's stock dropped from $46.72 per share at the close of trading on November 16, 2020, to $36.21 per share at the close of trading on November 17, 2020, a drop of $10.51, or 23%, on a trading volume of over 23 million shares, the largest trading volume since the Company's IPO.

73.     Just six months later Amazon made another announcement about its PrimeRx product that again caused investors concern about the competitive risk posed by Amazon entering the prescription drug discount market. On May 11, 2021, Amazon announced the addition of new features to its PrimeRx product that, like GoodRx, allows consumers to compare prescription prices at over 60,000 pharmacies nationwide. In response to this news, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021 and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8% showing that GoodRx's IPO price did not accurately represent its actual value. When GoodRx announced its first quarter earnings just two days later on May 13, 2021, the Company's stock price was still trading below the IPO price of $33 per share.

74.     In sum, at the time of the IPO, unbeknownst to investors, Amazon was developing and would soon introduce its own online and mobile prescription medication ordering and fulfillment service that would directly compete with GoodRx. Defendants timed the IPO so that it was priced before Amazon announced its online pharmaceutical business to facilitate the IPO and create artificial demand for the common shares sold therein, as well to maximize the amount of money the Company and the selling stockholders could raise in the IPO. Given Defendants' knowledge of Amazon's intention to enter the online pharmaceutical business, and their misleading statements about GoodRx's competitive position made contemporaneously with that knowledge, Defendants' materially false and/or misleading statements alleged herein were made willfully and caused GoodRx common stock to trade at artificially inflated prices during the Relevant Period.

**Materially False and Misleading Statements and Omissions During the Relevant Period**

75.     The Relevant Period begins on September 23, 2020, the first day GoodRx common stock began publicly trading on the NASDAQ. The previous day, the SEC had declared the Registration Statement effective. The Registration Statement remained alive and uncorrected throughout the Relevant Period and was incorporated into and formed part of the Prospectus filed on September 24, 2020.

76.     The Registration Statement contained materially false and misleading statements about GoodRx's competitive positioning, stating, in pertinent part: "***Our partnerships across the healthcare ecosystem, scale and strong consumer brand create a deep competitive moat that is reinforced by our proprietary technology platform***, which processes over 150 billion pricing data points every day and integrates that data into an interface that is convenient and easy to use for consumers."[4]

77.     Similarly, the Registration Statement stated, in pertinent part: "***We are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position.***"

78.     The Registration Statement also identified various competitive advantages which purportedly "set[] [GoodRx] [a]part," stating, in pertinent part:

**What Sets Us Apart**

*We are a market leader with a significant scale and brand advantage over our competitors. Our growth accelerates self-reinforcing network effects that further strengthen our competitive position. Our competitive strengths consist of:*

- ***Leading Platform***: We believe that we are the largest platform that aggregates pricing for prescriptions. Our proprietary platform enables us to collect and normalize over 150 billion prescription pricing data points every day from sources spanning the healthcare industry.

---

[4] Unless otherwise noted, all emphasis herein is added.

- **_Trusted Brand_**: We have built a trusted brand based on nearly a decade of consumer-focused product development. We strive to be with the consumer throughout their healthcare journey. We are guided by the principle of doing well for consumers and the healthcare industry as a whole, which we believe helps us build trust, engagement and brand loyalty.

- **_Scaled and Growing Network_**: Our leading consumer-focused digital healthcare platform and brand have facilitated rapid growth in our consumer base, which has helped us achieve significant scale. As we have scaled, we have been able to increase the savings that we provide our consumers, in part by leveraging our growing consumer base to attract more partners and source better prices.

- **_Consumer-focus_**: We empower consumers with the tools and resources to navigate the complexity of the healthcare system. Our platform delivers a consumer-first experience that is convenient and is easy to use and understand.

- **_Extensible Platform_**: The large number of highly engaged consumers who trust our brand and platform provide a strong foundation for the development of new products that extend across the healthcare market. We have demonstrated our ability to develop new products such as our subscription offerings and pharmaceutical manufacturer solutions offering, and integrate acquired companies such as HeyDoctor.

- **_Cash Generative Monetization Model_**: We believe our business model has facilitated the rapid growth and expansion of our platform. We have a track record of generating cash flows, allowing us to reinvest in platform expansion and growth.

79.     In addition, the Registration Statement provided generic statements of potential competitive pressures that "may" or "could" impact GoodRx's business in the future but failed to disclose the imminent and known direct competitor that was being developed by Amazon at the time of the IPO, which would have severe negative consequences for GoodRx's business, operations and financial prospects. Indeed, the Registration Statement did not even identify Amazon as a potential competitor, instead stating in pertinent part:

> We compete with companies that provide savings on prescriptions, as well as companies that offer telehealth services and advertising and market access for

pharmaceutical manufacturers. Within the prescriptions market, our competition is fragmented and consists of competitors that are smaller than us in scale. There can be no assurance that competitors will not develop and market similar offerings to ours, or that industry participants, such as integrated PBMs and pharmacy providers, will not seek to leverage our platform to drive consumer demand and traffic to their networks and eventually away from, or outside of, our platform. We ***may*** face increased competition from those that attempt to replicate our business model or marketing tactics, such as discount websites, apps, cash back and loyalty programs and new comparison shopping sites from various industry participants, any of which ***could*** impact our ability to attract and retain consumers.

80.    Rather than disclose the truth, the Registration Statement highlighted the Company's purported successes in growing its market share, stating, in pertinent part:

Our success is demonstrated by our 4.4 million Monthly Active Consumers for the second quarter of 2020, the 15 million Monthly Visitors for the second quarter of 2020, the approximately $20 billion of cumulative consumer savings generated for GoodRx consumers through June 30, 2020 and our consumer and healthcare professional NPS scores of 90 and 86, respectively, as of February 2020. On average, we have been the most downloaded medical app on the Apple App Store and Google Play App Store for the last three years. Our GoodRx app had a rating of 4.8 out of 5.0 stars in the Apple App Store and 4.7 out of 5.0 stars in the Google Play App Store, with over 700,000 combined reviews as of June 30, 2020. In both app stores, our HeyDoctor app had a rating of 5.0 out of 5.0 stars, with over 8,000 combined reviews as of June 30, 2020.

81.    The Registration Statement likewise stated: "We believe our financial results reflect the significant market demand for our offerings and the value that we provide to the broader healthcare ecosystem."

82.    Moreover, the Registration Statement highlighted the Company's close cooperation with Amazon and the purported benefits provided to GoodRx's business and platform as a result of this close relationship. For example, the Registration Statement represented: "We leverage major third-party cloud and data service providers, such as Amazon Web Services" and claimed that GoodRx had "built a modular system of services on top of this

infrastructure" that was "cloud native, scalable and reliable." The Registration continued, in pertinent part:

> **We rely on software-as-a-service, or SaaS, technologies from third parties**.
>
> We rely on SaaS technologies from third parties in order to operate critical functions of our business, including financial management services, relationship management services, marketing services and data storage services. For example, we rely on Amazon Web Services for a substantial portion of our computing and storage capacity . . . . Amazon Web Services provides us with computing and storage capacity pursuant to an agreement that continues until terminated by either party.

83.     On November 12, 2020, GoodRx issued a press release announcing its financial results for the 2020 third quarter, the period ended September 30, 2020. Later that day, GoodRx held a conference call with analysts and investors to discuss the Company's operations and earnings release. During the conference call, just four business days before Amazon announced its intention to enter the online pharmaceutical business, Defendants were asked by a securities analyst to "talk about any changes you're seeing in the competitive environment." In response, Defendant Bezdek falsely and misleadingly stated, in pertinent part, *"what we've seen is we have not seen sort of any competitors that have really impacted our business in any way sort of historically or currently."*

84.     The statements referenced above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Amazon's imminent entry into the online pharmaceutical business, which were known to Defendants or recklessly disregarded by them.

85.     Specifically, Defendants knew, but failed to disclose, that Amazon had been in the process of developing and would soon introduce its own online and mobile prescription medication ordering and fulfillment service. Indeed, numerous media outlets had been reporting

about Amazon's anticipated foray into the online pharmaceutical business after its 2018 acquisition of PillPack, Inc., an online pharmacy startup founded in 2013. However, outside investors did not know the scope or specific nature of Amazon's pharmaceutical activities until the revelations detailed herein, including Amazon's use of discount cards that can be used in brick-and-mortar pharmacies, its plans to enter the discount cash-pay market and its attempt to directly replicate and compete with the GoodRx business model.

86.    Moreover, Defendants were aware that Amazon's entry into the online prescription medication ordering and fulfillment business was imminent because of the Company's close relationship with Amazon and reliance on Amazon Web Services to support the Company's platform. Furthermore, Amazon subsequently teamed up with Inside Rx, a leading source for prescription drug prices and savings in the United States that procures discounts on thousands of brand name and generic medications. GoodRx has been a partner of Inside Rx since May 2017, and its website states that it and Inside Rx have partnered with major drug manufacturers and pharmacies to reduce the cost of more than 209 brand-name prescription drugs.

**The Truth Emerges**

87.    On November 17, 2020, just weeks after GoodRx completed its IPO, Amazon announced two new pharmacy offerings: a Prime Rx plan and a discount card program, which, among other things, would compete directly with GoodRx's platform by making it "simple for customers to compare prices and purchase medications for home delivery, all in one place." The Amazon press release stated, in pertinent part:

> Amazon.com, Inc. (NASDAQ: AMZN) today announced two new pharmacy offerings to help customers conveniently purchase their prescription medications. Amazon Pharmacy, a new store on Amazon, allows customers to complete an entire pharmacy transaction on their desktop or mobile device through the

Amazon App. Using a secure pharmacy profile, customers can add their insurance information, manage prescriptions, and choose payment options before checking out. Prime members receive unlimited, free two-day delivery on orders from Amazon Pharmacy included with their membership. . . .

Also new today, Prime members can access savings on medications at Amazon Pharmacy when paying without insurance, as well as at over 50,000 other participating pharmacies nationwide. The Amazon Prime prescription savings benefit saves members up to 80% off generic and 40% off brand name medications when paying without insurance. Prime members will have access to their prescription savings at checkout on Amazon Pharmacy, or can learn more at amazon.com/primerx.

**Together the Amazon Prime prescription savings benefit and Amazon Pharmacy make it simple for customers to compare prices and purchase medications for home delivery, all in one place.**

88.    That same day, CNBC.com reported that Amazon Prime members would now have access to discounts of up to 80% on generic medications and up to 40% on brand-name prescriptions through its relationship with the Inside Rx savings program. This competitive pricing posed a severe threat to GoodRx's business model.

89.    In response to this news, the price of GoodRx common stock declined 23%, from $46.72 per share to $36.21 per share by market close on November 17, 2020, erasing more than $4 billion of the Company's market capitalization on extremely heavy trading volume of over 23 million shares traded. Prior to the disclosure of the adverse facts detailed above, Andrew Slutsky, the Company's Consumer President, and Idea Men, LLC, an entity whose managing members included Defendants Hirsch and Bezdek, collectively sold $132 million worth of GoodRx common stock in the IPO.

90.    After Amazon's Prime Rx plan and discount card program were made public, securities analysts downgraded and slashed price targets on GoodRx common shares on fears that Amazon's pharmacy offerings would materially impact the Company's business and that GoodRx's price saving tools could be made irrelevant by Amazon's discounts. For example, J.P.

Morgan analysts downgraded GoodRx shares to underweight with a $29 price target, citing pressure from Amazon's PrimeRx plan and discount card program. Similarly, Deutsche Bank also cut its GoodRx target price from $50 to $31 and maintained a hold rating.

91.     Then, on May 11, 2021, Amazon made another announcement about its PrimeRx product that again caused investors concern about the competitive risk posed by Amazon entering the prescription drug discount market. Amazon announced the addition of new feature to its PrimeRx product that, like GoodRx, allows consumers to compare prescription prices at over 60,000 pharmacies nationwide. In response to this news, GoodRx's stock price dropped another $1.06 from a close of $31.45 per share on May 10, 2021 to close of $30.59 per share on May 11, 2021 and continued to drop on May 12, 2021 to close at $29.48 per share, for a two day drop of almost 8%. When GoodRx announced its first quarter earnings just two days later on May 13, 2021, the Company's stock price was still trading below the IPO price of $33 per share.

92.

93.     During the Relevant Period, Defendants materially misled the investing public, thereby inflating the price of GoodRx common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein. As a result of the alleged materially false and/or misleading statements, and/or omissions of material fact alleged herein, GoodRx common stock traded at artificially inflated prices during the Relevant Period.

94.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the

damages sustained by plaintiff. As described herein, during the Relevant Period, Defendants made or caused to be made a series of materially false or misleading statements about GoodRx's business, competition, competitive market trends and its operations. These material misstatements and omissions had the cause and effect of creating in the marketplace an unrealistically positive assessment of GoodRx, its business, competitive risks, services, and financial prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Relevant Period resulted in the plaintiff purchasing GoodRx common stock at artificially inflated prices, thus causing the damages complained of herein.

**DAMAGES TO THE COMPANY**

95.    GoodRx has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, GoodRx has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

  a.  costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

  b.  substantial loss of market capital;

  c.  costs already incurred and to be incurred defending the Securities Class Action; and

  d.  any fines or other liability resulting from the Company's violations of federal law.

96.    In addition, GoodRx's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

97.     The wrongdoing complained of herein has irreparably damaged GoodRx's corporate image and goodwill.  For at least the foreseeable future, GoodRx will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that GoodRx's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.     Plaintiff brings this action derivatively in the right and for the benefit of GoodRx to redress injuries suffered, and to be suffered, by GoodRx as a direct result of violations of federal securities laws by the Defendants.  GoodRx is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.     The Board of GoodRx, at the time this action was commenced, consisted of Defendants Hirsch, Bezdek, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud, a total of 10 individuals.

100.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the GoodRx Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

101.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business

and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

102.   Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

### Demand is Futile as to Defendant Hirsch Because of His
### Principal Professional Occupation as the Company's Co-CEO

103.   Defendant Hirsch has been CEO of GoodRx since 2011. Defendant Hirsch is also a member of the Board and the Co-founder of the Company. In his role as Co-CEO for the fiscal year of 2020, Defendant Hirsch received $267,650,186 in total compensation. The Company does not claim that Defendant Hirsch is an independent director and because his primary source of income and primary employment is his employment as Co-CEO of GoodRx and his professional reputation is inextricably bound to his role at GoodRx, Defendant Hirsch is incapable of acting independently and demand is futile upon him.

### Demand is Futile as to Defendant Bezdek of His
### Principal Professional Occupation as the Company's Co-CEO

104.   Defendant Bezdek has been the Co-CEO and a director of GoodRx since September 2011. Defendant Bezdek is also a Co-founder of the Company. Defendant Bezdek is a member of the Nominating and Corporate Governance Committee and the Compliance Committee. In his role as Co-CEO for the fiscal year of 2020, Defendant Bezdek received $267,652,442 in total compensation. The Company does not claim that Defendant Bezdek is an independent director and because his primary source of income and primary employment is his employment as Co-CEO of GoodRx and his professional reputation is inextricably bound to his

role at GoodRx, Defendant Bezdek is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Members of the Audit Committee**

105.     Demand is futile as to Defendants Bradley, Karol, Kosecoff, and Rey-Giraud as members of the Audit Committee for their knowing failure to fulfill their responsibilities.

106.     The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The Audit Committee Charter notes that the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of GoodRx Holdings, Inc. (the "Company") and the audits of the financial statements of the Company."

107.     Specifically, the Audit Committee Charter notes:

The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under the "Management's Discussion and Analysis of Financial Condition and Results of Operations."

108.     The Audit Committee Charter also notes:

The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

109.     Upon information and belief, in their capacity as members of the Audit Committee, Defendants Bradley, Karol, Kosecoff, and Rey-Giraud were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

110.     The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material

information. In their capacity as members of the Audit Committee, Defendants Bradley, Karol, Kosecoff, and Rey-Giraud were charged with ensuring that these reports did not contain such materially misleading information. By allowing documents to be filed with misleading information, Defendants Bradley, Karol, Kosecoff, and Rey-Giraud face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, Defendants Bradley, Karol, Kosecoff, and Rey-Giraud cannot adequately independently consider a demand.

**Demand is Futile as to the Members of the Compliance Committee**

111.    Demand is futile as to Defendants Bezdek, Karol, LeSieur, and Rey-Giraud as members of the Compliance Committee for their knowing failure to fulfill their responsibilities.

112.    The Board adopted a Compliance Committee Charter, setting forth the responsibilities of the Compliance Committee. The Compliance Committee Charter notes that the purpose of the Compliance Committee is to "assist the Board of Directors (the "Board") of GoodRx Holdings, Inc. (the "Company") in discharging its oversight responsibilities with respect to compliance with federal and state laws and regulations relating to healthcare."

113.    Specifically, the Compliance Committee is responsible for "provid[ing] general oversight of the Company's compliance processes and procedures and monitor its performance with respect to the legal and regulatory requirements of its healthcare business operations."

114.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Compliance Committee, Defendants Bezdek, Karol, LeSieur, and Rey-Giraud would have been well aware of the competition faced by the Company, specifically that related to Amazon. However, by allowing documents to be filed with misleading information, Defendants Bezdek, Karol, LeSieur, and Rey-Giraud face a sufficiently

34

significant likelihood of liability so as to render them interested. Accordingly, Defendants Bezdek, Karol, LeSieur, and Rey-Giraud cannot adequately independently consider a demand.

**Demand is Futile as to the Director Defendants**

115.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

116.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.  This is even more true given the importance of the Company's sequencing instruments to its bottom line.

117.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  In addition, each of the Director Defendants signed the Registration Statement, which was false and misleading when issued. By authorizing the false and misleading statements and material omissions described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

118.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

## COUNT I

### Against the Officer Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

119.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

120.    As a result of the conduct and events alleged above, GoodRx has been named as a defendant in the Securities Class Action brought on behalf of GoodRx shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

121.    Federal law provides GoodRx with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, GoodRx has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling GoodRx to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Securities Class Action, and sets forth specific rules regarding the determination of claims for such contribution.

122.    Accordingly, Plaintiff, on behalf of GoodRx, hereby claims contribution against the Officer Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with GoodRx under Rule 10b-5, or if joined in such actions, would be liable for the same damages as GoodRx.

123.   GoodRx claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Officer Defendants**

124.   Throughout the Relevant Period, the Officer Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Amazon was developing and imminently releasing an online pharmacy offering heavily discounted prescription medication; (2) the Individual Defendants intentionally held the Company's IPO before Amazon announced this service, to avoid having its existence negatively affect the Company's IPO share price; and (3) thus the IPO was intentionally planned in such a way as to sell shares of the Company's common stock at artificially inflated prices. As a result, GoodRx's public statements were materially false and misleading at all relevant times

125.   The plaintiffs in the Securities Class Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing GoodRx securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

126.   The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

127.   The plaintiffs in the Securities Class Action were unaware of the false and

misleading nature of said statements and omissive disclosures.

128.     When the Officer Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of GoodRx, the Officer Defendants were privy to information regarding the Company's clinical trials, and would have been well aware that the information issued by the Company concerning their status was false and misleading at the time the statements were made.

129.     Accordingly, the Officer Defendants are liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if GoodRx were to be held liable in the Securities Class Action, the Officer Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of GoodRx.

**Allegations Regarding the Officer Defendants as Control Persons**

130.     In acting as alleged above, the Officer Defendants were acting as authorized agents of GoodRx in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

131.     The Officer Defendants were "controlling persons" of GoodRx within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Officer Defendants could be held liable to the plaintiffs in the Securities Class Action.  Were the Company to be held liable in said Securities Class Action, the Officer Defendants would be liable to it for contribution.

132.    Plaintiff hereby derivatively claims such right of contribution on behalf of GoodRx.

## COUNT II

### Against the Individual Defendants for Breaches of Fiduciary Duty

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    The Individual Defendants owed and owe GoodRx fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe GoodRx the highest obligation of good faith, loyalty, and due care.

135.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to GoodRx shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

136.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused GoodRx to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to GoodRx and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

137.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

138.    Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

## COUNT III

### Against all the Individual Defendants for Unjust Enrichment

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of GoodRx.

141.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to GoodRx.

142.    Plaintiff, as a shareholder and representative of GoodRx, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

143.    Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Abuse of Control

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of GoodRx and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

146.     As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

147.     Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT V

### Against the Individual Defendants for Gross Mismanagement

148.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.     The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.   Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

150.     Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

151.     By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of GoodRx's affairs and in the use and preservation of GoodRx's assets.

152.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused GoodRx to engage in the conduct complained of herein which

they knew had an unreasonable risk of damage to GoodRx, thus breaching their duties to the Company.

153.    As a result, the Individual Defendants grossly mismanaged GoodRx and should be liable to the Company for the resulting damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of GoodRx and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to GoodRx the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing GoodRx and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect GoodRx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

      D.     Determining and awarding to GoodRx exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

      E.     Awarding GoodRx restitution from Defendants, and each of them;

      F.     Awarding GoodRx contribution from the Officer Defendants, and each of them;

      G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      H.     Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 15, 2021               Respectfully submitted,

                                      **COOCH AND TAYLOR P.A.**

                                      */s/ Blake A. Bennett*
                                      Blake A. Bennett (#5133)
                                      The Nemours Building
                                      1007 N. Orange St., Suite 1120
                                      Wilmington, DE 19801
                                      (302) 984-3800
                                      bbennett@coochtaylor.com
                                      *Attorney for Plaintiff*

**OF COUNSEL:**
Joshua M. Lifshitz
**LIFSHITZ LAW FIRM, P.C.**
1190 Broadway,
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376
*Attorneys for Plaintiff*

43